**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2627-21

MARLENE CARIDE,
COMMISSIONER, NEW JERSEY
DEPARTMENT OF BANKING
AND INSURANCE,

      Petitioner-Respondent,

v.

PAUL B. KUMAR,

      Respondent-Appellant.

_____

Argued October 31, 2023 – Decided December 29, 2023

Before Judges Whipple, Mayer and Paganelli.

On appeal from the New Jersey Department of Banking and Insurance, Docket No. OTSC #E18-54.

Michael James Confusione argued the cause for appellant (Hegge and Confusione, LLC, attorneys; Michael James Confusione, of counsel and on the briefs).

Richard E. Wegryn, Jr., Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorneys; Donna Sue Arons,

Assistant Attorney General, of counsel; Telge Nadeesha Peiris, Deputy Attorney General, on the brief).

PER CURIAM

Appellant Paul B. Kumar appeals from a final agency decision of Commissioner of the Department of Banking and Insurance (Commissioner or Department), revoking his insurance producer license and imposing $60,774.25 in civil penalties, surcharge, attorney's fees and costs of investigation, for violations of the New Jersey Insurance Producer Licensing Act of 2001 (Producer Act), N.J.S.A. 17:22A-26 to -48; N.J.A.C. 11:17A-4.2; and the New Jersey Insurance Fraud Prevention Act (Fraud Act), N.J.S.A. 17:33A-1 to -30. We affirm.

I.

We derive the facts from the record developed at the hearing conducted in the Office of Administrative Law (OAL). Since October 1, 2008, Kumar was a licensed insurance producer in the State of New Jersey.

"On August 3, 2015, Kumar entered into an employment contract with Combined Insurance Company (Combined)." For any insurance policy to be written, Combined requires: the producer to meet, face to face, with the insurance applicant; the applicant to sign the application; and the producer to

witness the applicant's signature on the application. These requirements were never waived and applied to Kumar.

Combined provided Kumar with a lead sheet for an existing customer, Joseph Hunsicker. The lead sheet "listed Joseph's address as 124 W. Farrell Ave, Apt. A2, Trenton, New Jersey . . . ." On September 23, 2015, Kumar and Joseph met at Joseph's home in Ewing, New Jersey. Kumar submitted insurance applications to Combined on Joseph's behalf. Joseph referred Kumar to family members, including: Ronald Hunsicker, his brother; Kathleen Seibert, Ronald's wife; Robin Hunsicker, Ronald's daughter; and Robert Hunsicker, Ronald's son.[1]

On November 7, 2015, Kumar submitted an insurance application to Combined on behalf of Ronald. However, Ronald had advised Kumar that he did not need insurance because "he had coverage from his employer." Moreover, Ronald "never met Kumar, never applied for insurance with Combined and never signed the applications in Kumar's presence." Indeed, on the day Kumar submitted Ronald's application, Ronald and Kathleen were "enroute to a vacation in Mexico." Further, this application contained the "incorrect spelling of [Kathleen]'s first name, her incorrect legal last name and

---

[1] Since there are a number of individuals with the last name Hunsicker we refer to them by their first name. We intend no disrespect.

her incorrect birthdate." Moreover, the insurance application erroneously listed his address as Joseph's from the lead sheet even though Ronald resided in Delaware.

"On December 9, 2015, Kumar submitted a second insurance application to Combined for Ronald." Again, the insurance application listed his wrong address and contained Ronald's incorrect height and weight.

Also on December 9, Kumar submitted an insurance application to Combined on behalf of Kathleen. However, Kathleen "never met Kumar, never applied for insurance with Combined, and never signed any applications for insurance in the presence of Kumar." The insurance application "erroneously listed her address [as Joseph's from the lead sheet] even though [Kathleen] resided in Delaware"; "incorrectly listed [Kathleen]'s height, weight, and the existence of prior life insurance."

Kumar submitted an insurance application to Combined on behalf of Robin on November 7, 2015, and two more on December 16, 2015. However, "Robin never met Kumar, never applied for insurance with Combined, and never signed any applications for insurance in the presence of Kumar." The November 7 application listed Robin's wrong date of birth; the first December 16 application listed her wrong "middle initial, birthdate, height and weight and

4

that she did not have insurance"; and the second December 16 application listed the wrong "middle initial, birthdate, occupation, employer, height and weight, income and physician." When Robin discovered the insurance applications were submitted, she sent "a letter to Combined requesting [for] Combined to cancel the policy."

"On November 2, 2015, Kumar submitted two insurance applications to Combined for Robert." While Robert provided Kumar with "his name, address and date of birth . . . he never applied for a policy, never met Kumar, and never signed the two applications submitted by Kumar under his name."

Dana Camadine (Camadine), Combined's manager of its compliance department, "became aware of the applications upon her review of the weekly compensation report." The applications were listed on the report because they were above a designated dollar threshold. She initiated an investigation. Ultimately, she "prepared an investigative report which concluded that Kumar violated company policy by submitting fraudulent applications to the company." Kumar "was terminated for violation of Combine[d]'s zero tolerance policy." "When Kumar was terminated, a referral was made to the State for insurance fraud . . . ."

A-2627-21

On May 28, 2018, the Department issued a two-count Order to Show Cause (OTSC) to Kumar concerning the insurance applications. In the first count, the Department alleged violations of the Producer's Act, N.J.S.A. 17:22A-40a(2), (5), (7), (8), (10), and (16); and N.J.A.C. 11:17A-4.2 because Kumar did not "witness the signature[s] of prospective insured[s]; did not have . . . face to face meeting[s] with the prospective insured[s] with regard to the application prior to submitting it, and forged the prospective insureds' signatures on the applications."

In the second count, the Department alleged violations of the Fraud Act, N.J.S.A. 17:33A-4a(3) and 4a(4)(b), because Kumar "submitted . . . insurance policy applications to Combined . . . for the purpose of obtaining an insurance policy, knowing that each of these applications contained a forged signature of the prospective insured, and other false or misleading information concerning any fact or thing material to the application or contract . . . . "

The Department demanded that Kumar show cause why: his New Jersey insurance producer license should not be suspended or revoked pursuant to N.J.S.A. 17:22A-40a; civil penalties should not be assessed under the Fraud Act, N.J.S.A. 17:33A-5(c) and N.J.A.C. 11:16-7.9(a); a surcharge should not be imposed under N.J.S.A. 17:33A-5.1; civil penalties should not be assessed under

N.J.S.A. 17:22A-45(c); costs of the investigation and prosecution, including attorney's fees, should not be reimbursed pursuant to N.J.S.A. 17:22A-45(c), N.J.S.A. 17:33A-5(c) and N.J.A.C. 11:16-7.9(a).

Kumar disputed the charges, and the Department transmitted the matter to the OAL for hearing as a contested case. The ALJ held hearings on August 12, 13, 19, and September 3, 2020. At the conclusion of the hearings, the ALJ issued a thorough fifty-three-page decision.

The ALJ made detailed findings regarding the witnesses' credibility. There were several witnesses summoned to testify: Camadine; Nicholas Catalano (Catalano), Combined's market director; Eugene Shannon (Shannon), the Department's investigator; Ronald; Kathleen; and Robin; and Kumar and his current supervisor from a different employer.

The ALJ found "Camadine, Catalano and Shannon to be credible witnesses who provided consistent and believable testimony. Their testimony was professional, clear, direct, and consistent with the record."

The ALJ found the testimony of Ronald, Kathleen, and Robin credible. The ALJ determined that "[a]ll three witnesses provided consistent, clear, and direct testimony," and noted that nothing "in any of the witnesses' tone,

expression, or demeanor" lead him to conclude that anyone "was not being truthful."

To the contrary, the ALJ found Kumar's "entire testimony was not credible, and not believable."  The ALJ concluded

> [Kumar] demonstrated throughout these proceedings that his inconsistent, evasive and confusing testimony, along with the remarkable refreshment of his recollections that support his version of the events at issue from September to December of 2015 cannot be believed.

Turning to the merits, the ALJ found "by any measure, the submission of [eight] application[s] for insurance under the applicant's name, without their knowledge, outside their presence, and without their consent, render[ed] the entire application[s] fraudulent."  Therefore, the ALJ concluded, the Department met its burden by demonstrating that Kumar submitted eight fraudulent applications for insurance.  Further, "knowing that each of the applications contained a forged signature of the prospective insured and other false or misleading information," there was "no doubt that Kumar knew that he submitted applications with forged signatures and materially false information to Combined in order to obtain insurance policies."

The ALJ concluded that Kumar's actions warranted revocation of his producer license; the imposition of statutory monetary penalties; reimbursement

8

of investigation costs; and attorney's fees. In determining the amount of the monetary penalty, the ALJ made detailed findings and concluded that: (1) Kumar acted in "bad faith" by "submit[ting] eight insurance applications" without: meeting with the alleged applicants; the alleged applicants' knowledge or consent; obtaining the alleged applicants' signatures; and witnessing their signatures and "submit[ting] the[] fraudulent applications which contained forged signatures, to Combined in order to obtain insurance policies"; (2) a moderate penalty was appropriate; (3) Kumar did not obtain any profit; (4) the public was injured because Kumar's actions violated a fiduciary trust; (5) the activity only lasted a short duration; (6) there were no criminal charges or treble damages action; and (7) Kumar had no prior Producer or Fraud Act violations. (citing Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123, 137-39 (1987)).

The ALJ imposed a penalty of $1,250 for each of the eight Producer Act violations; $1,250 for each of the eight Fraud Act violations; $1,000 surcharge under the Fraud Act; $9,774.25 for the costs of the investigation and prosecution under the Fraud Act; and attorney's fees of $35,000 under the Producer Act, for a total penalty of $65,774.25.

9

On March 30, 2022, the Commissioner rendered a comprehensive seventy-six-page final decision.[2] The Commissioner reviewed the ALJ's decision and recommendation, and the exceptions and replies filed by the parties. The Commissioner found "no basis on which to reject the ALJ's credibility determinations because there [wa]s no specific evidence on which to overturn the ALJ's credibility findings." Additionally, the Commissioner concluded "the ALJ's reasoning for his credibility determinations was thorough, detailed and persuasive."

The Commissioner adopted the ALJ's determination that "the Department proved . . . [Kumar] violated N.J.S.A. 17:22A-40(a)(2), (5), (7), (8) and (16) and N.J.A.C. 11:17A-4.2" in the transactions with Ronald, Kathleen and Robin. She also adopted "the ALJ's determination that the Department did [not] prove that [Kumar] violated N.J.S.A. 17:22A-40(a)(10) (forging another's name to an application)."

Further, the Commissioner adopted the ALJ's finding that the Department established Kumar violated the Fraud Act, because he "knowingly concealed

_____

[2] On April 5, 2022, the Commissioner executed an order amending the final decision. She corrected a typographical error that indicated that the Department had proved Kumar violated N.J.S.A. 17:22A-40(a)(10) by forging another's name. In all other respects the final decision remains in full force and effect.

A-2627-21

that he met with Ronald, [Kathleen], and Robin and failed to disclose that they did not sign their applications," N.J.S.A. 17:33A-4(a)(3), and because he "submitted insurance applications that he knew contained false or misleading information regarding material facts," N.J.S.A. 17:33A-4(a)(4)(b).

The Commissioner rejected the ALJ's determination regarding the insurance applications involving Robert. She noted that Robert did not testify at the ALJ hearing and that the only evidence surrounding Robert's applications was "based on uncorroborated hearsay."

The Commissioner adopted the ALJ's recommendation to revoke Kumar's producer license. Moreover, while conducting her own analysis, she agreed with the ALJ's weighing of each of the Kimmelman factors. The Commissioner adopted the ALJ's recommendation that Kumar pay $1,250 per violation of both the Producer Act and the Fraud Act. However, she reduced the number of Kumar's violations to six per act, twelve total, removing Robert's two applications. Accordingly, the Commissioner ordered Kumar to pay $7,500 for the six violations of the Producer Act; $7,500 for the six violations of the Fraud Act; $1,000 surcharge under the Fraud Act; $9,774.25 for investigation and prosecution costs under the Fraud Act; and $35,000 in attorney's fees under the Producer Act, for a total monetary penalty of $60,774.25.

II.

Our scope of review of an administrative agency's final determination is limited. In re Herrmann, 192 N.J. 19, 27 (2007). "[A] 'strong presumption of reasonableness attaches'" to the agency's decision. In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (quoting In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993)). Decisions "made by an administrative agency entrusted to apply and enforce a statutory scheme" are reviewed "under an enhanced deferential standard." E. Bay Drywall, LLC v. Dep't of Labor and Workforce Dev., 251 N.J. 477, 494 (2022). This deference is particularly appropriate when the agency adopts the ALJ's findings because the ALJ, and not the agency, has the opportunity to hear live testimony and judge the witnesses' credibility. Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587-88 (1988).

Thus, we will "not disturb an administrative agency's determinations or findings unless there is a clear showing that[:] (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." In re Application of Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008). The burden is upon the appellant to demonstrate grounds for reversal. McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 563 (App. Div. 2002).

Administrative penalties "must be tested for reasonableness as applied to the specific facts involved." In re Garay, 89 N.J. 104, 115 (1982). To determine reasonableness, courts assess "whether [the] punishment is so disproportionate to the offense, in light of all circumstances as to be shocking to one's sense of fairness." In re License Issued to Zahl, 186 N.J. 341, 354 (2006) (quotation omitted). Our Supreme Court outlined seven factors for consideration when imposing civil penalties: (1) the good or bad faith of a defendant; (2) a defendant's ability to pay; (3) amount of profits obtained from the illegal activity; (4) injury to the public; (5) duration of the conspiracy; (6) existence of criminal or treble damages actions; and (7) past violations. Kimmelman, 108 N.J. at 137-39.

Applying these principles, we discern no basis for disturbing the Commissioner's reasoned determination.

A.

N.J.A.C. 11:17A-4.2 provides:

> In cases where an applicant's signature is required, an insurance producer who takes an application for insurance shall be required to witness the signature of the prospective insured on the application prior to submission of the application to the insurer only when the application is signed by the applicant after having been completed in a face to face meeting between the

13

producer and the prospective insured. This requirement may be waived, however, upon prior written authorization by the insurer.

Kumar argues the failures to "witness the signature of the prospective insured" and "have face to face meeting with the prospective insured with regard to the application before submitting it" are not violations of the Producer Act because that "conduct is not conduct that violates the laws and regulations imposed on an insurance producer (the witnessing and meeting)."

As to witnessing, Kumar avers the Commissioner "misstated the regulation" by "omit[ting] the critical 'only' from the language." Kumar interprets the regulation to require "witness[ing] only when the application is signed by the applicant after having been completed in a face to face meeting . . . ." Therefore, noting the "Commissioner affirmed the ALJ's finding that . . . Kumar and the three applicants in question did not meet in person . . . the witnessing requirement of N.J.A.C. 11:17A-4.2 did not apply." In further, support of his argument, Kumar cites to NJ Bulletin No. 2009-11[3] for the proposition that the regulation "require[d] witnessing only when a face to face meeting is conducted and only when required by the insurer." Again, he argues,

---

[3]  New Jersey Bulletin No. 2009-11, "N.J.A.C. 11:17A-4.2 INSURANCE PRODUCER TO WITNESS SIGNATURE OF INSURED" (April 13, 2009).

A-2627-21

since no face to face meeting took place, he could not be in violation of the "witness" requirement.

Moreover, Kumar asserts that there can be no violation of the "face to face" meeting requirement because such meetings are not required. Kumar again relies on NJ Bulletin No. 2009-11 for the proposition that there is a "changed environment . . . in light of ever-changing technological advancements permitting electronic communications and submissions of applications" and "amendment of in person witnessing of signature[s]."

We find Kumar's interpretation of the regulation unavailing. The language of the regulation empowers the insurer to control the requirements for insurance applications. The regulation provides for the insurer's authority by permitting a waiver of the requirements but only "upon prior written authorization by the insurer." N.J.A.C. 11:17A-4.2. Kumar acknowledges the insurer's authority in his cite to NJ Bulletin No. 2009-11 where he notes the regulation "require[s] witnessing only when a face to face meeting is conducted and <u>only when required by the insurer</u>." (emphasis added). Therefore, we find the Commissioner correctly interpreted the regulation and followed the law. <u>In re Virtua</u>, 194 N.J. at 422.

Moreover, Combined required Kumar to meet face to face, purportedly with Ronald, Kathleen and Robin, the insurance applicants; have them sign their applications for insurance; and have Kumar witness their signatures. Combined never waived those requirements and Kumar failed in every respect. Therefore, the Commissioner's finding that Kumar violated N.J.A.C. 11:17A-4.2 was "[not] arbitrary, capricious, or unreasonable and was supported by substantial evidence." Ibid.

B.

The Producer Act provides, in relevant part:

> a. The commissioner may . . . revoke . . . an insurance producer's license or may levy a civil penalty in accordance with subsection [N.J.S.A. 17:22A-45] of this act or any combination of actions, for any one or more of the following causes:
>
> (2) Violating any insurance laws, or violating any regulation, subpoena or order of the commissioner or of another state's insurance regulator;
>
> . . . .
>
> (5) Intentionally misrepresenting the terms of an actual or proposed insurance contract, policy or application for insurance;
>
> . . . .
>
> (7) Having admitted or been found to have committed any insurance unfair trade practice or fraud;

16

. . . .

(8) Using fraudulent, coercive or dishonest practices, or demonstrating incompetence, untrustworthiness or financial irresponsibility in the conduct of insurance business in this State or elsewhere;

. . . .

(16) Committing any fraudulent act;

. . . .

[N.J.S.A. 17:22A-40]

Here, the Commissioner determined that Kumar "submitted six applications for three separate individuals without the applicants' knowledge or consent." The "applications were rife with false information, [not attributable to mere sloppiness or inattention to detail], including basic information such as the applicants' birthdates[] and names." The Commissioner noted, for example, there was no explanation for Kumar having "an entirely different last name" for [Kathleen]; or "why [Kathleen] would sign her first name incorrectly and give a different last name"; or "how he met with Ronald on November 7, 2015 when Ronald . . . was traveling to Mexico that day."

Ultimately, the Commissioner adopted the ALJ's determination that the Department proved violations of N.J.S.A. 17:22A-40(a): (2) violating any

17

insurance law or any regulation; (5) intentionally misrepresenting the terms of an insurance contract, policy or application; (7) committing any insurance unfair trade practice or fraud; (8) fraudulent, coercive or dishonest practices, or demonstrating incompetence, untrustworthiness or financial irresponsibility; and (16) any fraudulent act.

Kumar repeats his arguments regarding the interpretation of N.J.A.C. 11:17A-4.2 and avers that "[b]ecause th[]e wrongs the Department charged under Count One . . . are not wrongs at all under governing rules and regulations (the witnessing and meeting charges), the Producer Act charge under Count One fails as a matter of law . . . ." Kumar asserts "[t]he Commissioner cannot declare that . . . [he] violated the Producer Act . . . for other claimed wrongs that are not set forth in the Department's [OTSC] without violating . . . [hi]s due process rights . . . ."

In response, the Commissioner states

> Kumar was acting as an agent for Combined. . . . [T]he Combined policies that Kumar obtained did not provide any benefit to Ronald, [Kathleen], and Robin. The applicants never applied for the policies and Kumar fraudulently submitted the applications under their names. As such, Kumar's submission of each application constituted not only a violation of N.J.A.C. 11:17A-4.2, but also a violation of Kumar's fiduciary duty to the applicants to obtain their consent and authorization to obtain the coverage.

We are persuaded by the Commissioner's argument. As we already stated, there is ample evidence to sustain the Commissioner's finding that Kumar violated N.J.A.C. 11:17A-4.2.

Moreover, there is "sufficient evidence" in the record to sustain the Commissioner's decision as to the violations of the Producer Act, including N.J.S.A. 17:22A-40(a)(2), (5), (7), (8), and (16).

Kumar's argument that these "other claimed 'wrongs' . . . were not charged in the O[TSC] . . . . [and] would, [therefore,] violate [his] due process rights" is unavailing. The OTSC specifically cited each section of the statute and detailed the allegations of Kumar's concerning behavior. "Fundamentally . . . [t]he minimum requirements of due process . . . are notice and the opportunity to be heard." Doe v. Poritz, 142 NJ. 1, 106 (1995). (citations omitted). Here, these requirements were met, Kumar suffered no violation of his due process rights.

Finding no merit to Kumar's interpretation of the regulation, N.J.A.C. 11:17A-4.2 and sufficient evidence that Kumar violated N.J.S.A. 17:22A-40(a)(2), (5), (7), (8), and (16) and N.J.A.C. 11:17A-4.2, we affirm the Commissioner's findings and determinations that Kumar violated the Producer Act.

C.

The Commissioner determined that Kumar violated the Fraud Act, N.J.S.A. 17:33A-1 to -30.  She stated,

> the evidence show[ed] that [Kumar] submitted six applications for three separate individuals without the applicants' knowledge or consent.  The applications were rife with false information, including basic information, such as the applicants' addresses, birthdates and names.  The applicants did not sign these applications. . . .  [Kumar] was undoubtedly aware that he submitted applications with materially false information to Combined in order for these policies to be issued.

Therefore, the Commissioner concluded that the Department proved the following violations:

> N.J.S.A. 17:33A-4(a)(3) (conceals or knowingly fails to disclose the occurrence of an event which affects any person's initial or continued right or entitlement to (a) any insurance benefit or payment or (b) the amount of any benefit or payment to which the person is entitled) because . . . [Kumar] knowingly concealed that he met with Ronald, [Kathleen], and Robin and failed to disclose that they did not sign their applications.
>
> . . . also . . . that . . . [Kumar] violated N.J.S.A. 17:33A-4(a)(b)(4) (makes any written or oral statement, intended to be presented to any insurance company or producer for the purpose of obtaining an insurance policy, knowing that the statement contains any false or misleading information concerning a material fact) because . . . [Kumar] submitted insurance applications that he knew contained false or misleading information concerning material facts.

Kumar argues that the Commissioner erred in finding he violated the Fraud Act because: (1) the Commissioner found he never met with the three purported insurance applicants and it was not established that he forged their signatures, therefore, there is no "substantial credible evidence . . . that [he] submitted the applications 'knowing' they contained forged signatures"; (2) there is no "event" that Kumar "concealed or knowingly failed to disclose" that "affect[ed]" the purported insurance applicants' "initial or continued right or entitlement to any (a) insurance benefit or payment or (b) the amount of any benefit or payment, N.J.S.A. 17:33A-4(a)(3)"; and (3) Kumar's misstatements were not "material to an insurance application or contract." N.J.S.A. 17:33A-4(a)(b)(4). We find Kumar's arguments unavailing.

Kumar argues there is no substantial evidence in the record to support the Commissioner's finding that he knowingly submitted the insurance applications with forged signatures. His argument misstates the Commissioner's finding. The Commissioner actually found "[t]he applicants did not sign these applications. . . . [and Kumar] was undoubtedly aware that he submitted applications with materially false information to Combined in order for these policies to be issued." There is substantial evidence in the record that Kumar never met with the three purported insurance applicants and submitted the

21

unauthorized applications with their claimed signatures. While the Commissioner did not find Kumar was the forger, that finding does not discount her finding that he never met with the applicants and submitted insurance applications with their signatures knowing they never signed the applications. There is substantial credible evidence to support the Commissioner's finding.

Next, Kumar argues that there was no "event" that he "concealed or failed to disclose" that "affected" the insurance applications. He limits the Commissioner's finding to the "applications were rife with false information, including basic information, such as the applicants' addresses, birthdates, and names" and argues it does not establish an "event" or if it is an "event" the Department failed to establish the incorrect information "'affected' the applicants' entitlement to coverage or benefits." However, this argument fails to appreciate that Kumar "concealed or knowingly failed to disclose" his submission of unauthorized insurance applications. There is substantial credible evidence to support the Commissioner's finding that Kumar violated N.J.S.A. 17:33A-4(a)(3).

Further, Kumar argues that his misstatements were not "material to an insurance application or contract." N.J.S.A. 17:33A-4(a)(b)(4). He avers that "incorrect heights, weights, addresses, etc., were not proven to have been

22

material."  However, his argument understates the Commissioner's determination.  The Commissioner found Kumar "submitted insurance applications that he knew contained false or misleading information concerning material facts."  That finding was not limited to the plethora of erroneous information contained in the unauthorized applications, but also included the submittal of the actual unauthorized applications.  The submittal of the unauthorized applications themselves was material "false and misleading information."  N.J.S.A. 17:33A-4(a)(b)(4).  There is substantial credible evidence to support the Commissioner's finding.

### D.

Kumar requests we "vacate the revocation of license . . . imposed under N.J.S.A. 17:22A-40."  He also argues that the "penalties, fines, and attorney's fees transgress the analysis of Kimmelman."

Under the Producer Act, N.J.S.A. 17:22A-40, "[t]he [C]ommissioner may . . . revoke . . . an insurance producer's license or may levy a civil penalty in accordance with [N.J.S.A. 1:22A-45] or any combination of actions, for any one or more of the following causes" listed therein.  Here, we affirm the Commissioner's finding that Kumar violated N.J.S.A. 17:22A-40(2), (5), (7), (8), and (16).

After detailing her "duty to protect the public welfare and to instill public confidence in both insurance producers and the industry as a whole," the Commissioner found "the record is more than sufficient to support license revocation and compels the revocation of [Kumar's] license." She noted Kumar "fraudulently produced six applications for three separate individuals without the applicants' knowledge or consent. These applications contained a myriad of false information, including basic information such as names, addresses and dates of birth."

Kumar acknowledges the "substantial deference to the Commissioner's determination," but argues since he: "held his producer license since 2008 . . . without any prior incidents or charged misconduct"; "ceased practicing" "[o]nce the disciplinary charges in this matter were lodged"; "was not permitted to practice for more than five years during which time he had no income in this field"; and "continued to comply with all his licensing requirements," he has suffered "proportionate punishment for the violations." He avers "[p]ermanent revocation is 'so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness,'" and warrants our intervention, quoting Matter of Polk, 90 N.J. at 578. In addition, Kumar refers to punishments levied in other matters and argues that his conduct did not rise to the level that

24

required revocation and something short of revocation should have been imposed as was done in other cases. Further, he argues that progressive discipline, "discipline based in part on the consideration of past conduct can be a factor in the determination of the appropriate penalty for present misconduct."

We find Kumar's arguments unavailing. The statute specifically authorizes the Commissioner to revoke the "insurance producer's license." N.J.S.A. 17:22A-40. In fact, the statute allows for revocation for "any one . . . of the" causes listed therein and we affirm five—N.J.S.A. 17:22A-40(2), (5), (7), (8), and (16). Moreover, Kumar's no longer practicing, following the lodging of the disciplinary charges, does not mitigate the conduct that led to the charges. Finally, his reliance on his past conduct or how others were punished for their failures is of no moment considering his behavior here. The Commissioner's decision is entitled to deference and will not be disturbed.

Kumar also argues that the Commissioner's assessment of "penalties, fines, and attorneys' fees transgress the analysis of Kimmelman." We disagree.

While the Commissioner agreed with the ALJ's analysis of the Kimmelman factors, she conducted her own review. She concluded certain factors weighed in favor of a higher penalty for Kumar, such as: his acting in bad faith, violating the public trust; and absence of criminal charges or other

25

sanctions. She found other factors weighed in favor of a lesser penalty for Kumar: he received no profit from his wrongful conduct; the short duration of his activity; and lack of prior Producer Act violations. Further, in relation "to his ability or inability to pay a civil penalty" the Commissioner weighed this factor to impose "a moderate monetary penalty."

Kumar accepts the Commissioner's findings on those factors that weigh in favor of a lesser penalty and failed to address the Commissioner's findings on those factors that weigh in favor of a higher penalty. As to his ability to pay, he merely relies on the same argument he made to the Commissioner, he "has no ability to pay the excessive fines and penalties in light of his 'virtually no savings to his name' and his limited income earned." However, after noting Kumar bore the burden of proving he had no "ability to pay civil penalties," and that he failed to offer evidence on this subject, the Commissioner determined the factor only warranted a moderate penalty. We have no reason to disturb the Commissioner's analysis.

The Producer Act, N.J.S.A. 17:22A-45(c) provides:

> Any person violating any provision of this act shall be liable to a penalty not exceeding $5,000 for the first offense and not exceeding $10,000 for each subsequent offense . . . . In addition, the commissioner . . . may order . . . reimbursement of costs of investigation and prosecution, as appropriate.

N.J.A.C. 11:17A-4.11 states "[t]he Commissioner shall impose penalties for violations of this subchapter[, including N.J.A.C. 11:17A-4.2(a)] in accordance with the provisions of N.J.S.A. 17:22A-26 . . . .[,]" the Producer's Act.

In addition, the Fraud Act, N.J.S.A. 17:33A-5(b) and -5(c), and N.J.S.A. 17:33A-5.1, provide:

> if a person violates [17:33A-4] the penalty shall be $5,000 for the first violation, $10,000 for the second violation and $15,000 for each subsequent violation. . . . In addition, the [C]ommissioner court shall also award court costs and reasonable attorney's fees to the commissioner.
>
> [N.J.S.A. 17:33A-5(b).]
>
> The Commissioner is authorized to assess a civil and administrative penalty of not more than $5,000 for the first violation, $10,000 for the second violation and $15,000 for each subsequent violation . . . .
>
> [N.J.S.A. 17:33A-5(c).]
>
> In addition to any other penalty, fine or charge imposed . . . a person who is found in any legal proceeding to have committed insurance fraud shall be subject to a surcharge in the amount of $1,000. . . .
>
> [N.J.S.A. 17:33A-5.1.]

The Commissioner imposed a penalty of $1,250 for each of Kumar's six violations of the Producer Act, and $1,250 for each of his six violations of the

27

Fraud Act. She also imposed a $1,000 surcharge. In total, Commissioner imposed a total statutory penalty of $16,000. This amount is fully supported in the record, is substantially less than the maximum penalty allowed, and therefore will not be disturbed.

In addition to monetary penalties, the Commissioner ordered Kumar to reimburse $9,772.15 for the costs of the investigation and $35,000 in attorney's fees. Kumar asserts the investigation amount is "excessive" but the amount was supported by the investigator's certification. Thus, we find no error in the award.

Moreover, Kumar argues the Commissioner's award of attorney's fees of $35,000 is "excessive." We note the ALJ had reduced the attorney's fees from the requested amount of $77,353.50 to $35,000. The Commissioner observed that the "amount is reasonable and less than half of the amount that could be ordered." We find no error in the award.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2627-21